Jeanne PEREZ–DENISON, Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN OF THE NORTHWEST, an Oregon Corporation, and David G. Fisher, Defendants.

No. 3:10–CV–00903–HU.

United States District Court,
D. Oregon,
Portland Division.

April 9, 2012.

Carl Lee Post, Daniel J. Snyder, Erin C. McCool, Law Offices of Daniel Snyder, Portland, OR, for Plaintiff.

Chris Kitchel, Amy Joseph Pedersen, Ryan S. Gibson, Stoel Rives LLP, Maryann Yelnosky, Emily Q. Shults, Bullard Smith Jernstedt Wilson, Portland, OR, for Defendants.

### ORDER ADOPTING FINDINGS & RECOMMENDATION

SIMON, District Judge.

On January 27, 2012, Magistrate Judge Dennis J. Hubel filed Findings and Recommendation (Dkt. 122) in this case. Judge Hubel recommended granting in part and denying in part both the motion for summary judgment filed by Defendant Kaiser Foundation Health Plan of the Northwest (Dkt. 47) and the motion for summary judgment filed by Defendant David G. Fisher (Dkt. 48). The matter is now before me pursuant to the Magistrates Act, 28 U.S.C. § 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure. Under the Magistrates Act, the court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files objec-

tions to a magistrate's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed.R.Civ.P. 72(b)(3); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir.2009). *De novo* review means that the court "considers the matter anew, as if no decision had been rendered." *Dawson*, 561 F.3d at 933.

Plaintiff and Defendants each filed timely objections to portions of Judge Hubel's Findings and Recommendation and responses to each other's objections. The parties have also presented oral argument on their objections and responses. After *de novo* review, I ADOPT Judge Hubel's Findings and Recommendation (Dkt. 122) for the reasons stated therein. Accordingly, Defendants' motions for summary judgment (Dkts. 47 and 48) are granted in part and denied in part for the reasons stated by Judge Hubel in his Findings and Recommendation (Dkt. 122).

## FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge:

### Findings and Recommendation

Presently before the court are defendants Kaiser Foundation Health Plan of the Northwest ("Kaiser") and David Fisher's ("Fisher") (collectively, "Defendants") motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c). Kaiser moves the court for an order granting it summary judgment on all of plaintiff Jeanne Perez Denison's ("Denison") claims, as well as summary judgment on Kaiser's two counterclaims asserted in its Amended Answer filed on April 12, 2011. Fisher moves for summary judgment against Denison's tort claim of invasion of privacy. For the reasons set forth below, Kaiser's motion (Docket No. 47) for summary judgment should be GRANTED in part and DENIED in part, and Fisher's motion (Docket No. 48) for summary judgment should be GRANTED in part and DENIED in part.

### Background

## I. Relevant Kaiser Employment Policies

Denison worked as a Registration Representative, also called a "Reg Rep" or member intake specialist ("MIS"), at Kaiser's Urgent Care center on North Interstate Avenue in Portland, Oregon. (Peterson Decl. ¶ 2; Denison Dep. 35:20–38:2.) Denison's job was to check in Kaiser members for Urgent Care appointments. (Peterson Decl. ¶ 6; Denison Dep. 38:11–21.) After July 2007, Fisher was the Urgent Care Business Operations Supervisor ("BOS") and Denison's direct supervisor. (Peterson Decl. ¶ 3.) Fisher's supervisor was Business Services Manager ("BSM") Brad Peterson ("Peterson") after February 2008. (Peterson Decl. ¶¶ 2–3.)

### A. Cash–Handling

As a MIS, Denison was required to handle cash from patient copays according to Kaiser's cash-handling policies. (Peterson Decl. ¶ 4.) On October 17, 2007, Denison signed a Cash Handling Agreement affirming that she would do so and admitted she considered cash handling essential to the performance of her duties. (Gibson Decl. Ex. A at 77; Denison Dep. 39:19–23, 68:2–69:16.) Each MIS must comply with several specific aspects of the cash-handling policies, such as the requirement that each MIS maintain a start-up fund of $150 in cash. (Peterson Decl. ¶ 6.) During a shift the start-up fund must be kept secured in a locked drawer at the MSI's workstation. (Peterson Decl. ¶ 6.) After a shift, cash is kept in a secure cash room accessible only by typing a passcode into a lock keypad. (Peterson Dep. 28:17–29:19; Fisher Dep. 85:14–88:13; Peterson Decl.

¶ 6.) Employees open the till locker with a key that must·be kept on their person at all times. (Fisher Dep. 88:19–91:20; Peterson Decl. ¶ 6.)

At the end of a shift, the MIS must properly document all cash received, return the $150 start-up fund to the till locker, and deposit any cash and checks received from patients during that shift into a safe in the cash room. (Peterson Decl. ¶ 7; Fisher Dep. 183:14–187:20.) An employee depositing cash must do so with another coworker present as a witness, and the coworker must sign the deposit documentation. (Peterson Decl. ¶ 7.) The safe is considered "dual custody," *e.g.*, Peterson and Fisher had one-half of the combination and the armored car company had the other half, so the safe could only be opened when both combinations were entered together. (Peterson Decl. ¶ 7.) To deposit cash, the MIS drops a cash bag containing the cash along with documentation into a weighted, cylindrical tumbler on top of the safe, and turns a handle to roll the tumbler until the bag drops into the safe. (Peterson Decl. ¶ 7; Fisher Dep. 85:14–88:13.) In November 2008, Fisher became aware that it was possible to place a deposit in the tumbler, turn it, and not have the deposit drop into the safe. (Gibson Decl. Ex. A at 190.) As a result, Fisher instructed all employees to "make sure you check the bottom of the tumbler after its turned to insure your bags have been dropped." (Gibson Decl. Ex. A at 190; Denison Dep. 227:18–228:4.)

### B. Corrective Action

Kaiser employs a progressive discipline system that includes five levels of "Corrective Action." (Peterson Decl. ¶ 8.) Under this system, employees are usually verbally counseled or coached for non-serious first-time workplace policy infractions. (Peterson Decl. ¶ 8.) Additional violations, or for more severe first-time violations, results in employees being issued a Cor-

rective Action, usually Level 1 or Level 2. (Peterson Decl. ¶ 8.) Levels 3 and 4 are generally reserved for employees that commit additional violations of a similar nature. (Peterson Decl. ¶ 8.) Kaiser considers Levels 1 and 2 to be coaching and counseling, while Levels 3 and 4 are disciplinary. (Peterson Decl. ¶ 8.) However, "[a] Level 4 Corrective Action is [ ] usually a 'last chance' agreement, also known as a 'Day of Decision.' " (Peterson Decl. ¶ 8.) When an employee is issued a Level 4 Correction Action, a meeting is held where the employee must choose to voluntarily resign or, alternatively, develop an action plan to detail how they will improve their performance. (Peterson Decl. ¶ 8.) "If an employee commits another policy violation while on Level 4 Corrective Action, the employee can be subject to termination." (Peterson Decl. ¶ 8.) Prior to issuing any Corrective Action, it is Kaiser's practice that the supervisor hold a discovery meeting with the employee to discuss the facts related to an alleged violation of workplace policy. (Peterson Decl. ¶ 9.) Because of the number of people involved in discovery meetings, it can often times take days or weeks to schedule an appropriate date. (Peterson Decl. ¶ 9.)

### II. Denison's Relevant Employment History

On July 18, 2007, Denison received a performance evaluation, wherein her previous supervisor, Karen Wood ("Wood"), indicated Denison "occasionally has difficulties with communication, particularly with her co-workers." (Denison Dep. 61:20–64:25; Gibson Decl. Ex. A at 73.) On October 19, 2007, Denison also received a performance evaluation from Fisher that indicated she had communication and teamwork issues. (Gibson Decl. Ex. A at 133.) Based on a November 2007 incident, Denison was issue a Level 1 Corrective Action because a supervisor, Brenda Leon-

ard ("Leonard"), filed a complaint against Denison which indicated:

> Leonard came in with a patient and stated that [Denison] did not verify patient ID, verify patient address, ask about TPL billing, ask about WC billing, and did not ask about COB benefits. [Leonard] also said that [Denison] was not pleasant to them, that the waiting room was messy (i.e. spilled coffee and food wrappers on the table) and that no copay was collected.

(Gibson Decl. Ex. A at 134; Denison Dep. 85:9–89:18.)

On February 25, 2008, Fisher sent Denison an email indicating that her cash drawer balancing was off "too often." (Gibson Decl. Ex. A at 138; Denison Dep. 91:7–92:25.) Denison later received training entitled "Collecting Balances Due." (Gibson Decl. Ex. A at 139; Denison Dep. 92:17–93:19.)

On March 23, 2008, Denison contacted Kaiser's Compliance Hotline to report that "Fisher require[d] her to work a 12–hour shift without any breaks (lunches or breaks)." (Denison Decl. Ex. Z at 2.) Kaiser conducted an investigation and determined:

> Denison worked Saturday night March 22, 2008 to Sunday Morning March 23, 2008 without any breaks or lunches. In this particular instance there was no one to cover all the shifts originally scheduled due to [people calling in sick]. The scheduler Trina Polk could not fill the entire 6 pm to 3:00 am shift, but did get someone to cover 6:00pm to 11:00pm. Jeanne's shift is 7:00pm to 7:30am so she worked by herself 11:00pm to 7:00am. Coverage for Jeanne's breaks were available the first part of her shift, but not for her entire shift. Jeanne mentioned that this wasn't just one instance, but has previously been the only person working during her 12 hour shift. . . . Jeanne did mention that sometimes ei-

> ther a supervisor (David) or the staff specialist (Trina) will get someone to come in and stay just long enough to cover breaks.

> Denison wants to hire more on-call employees to fill these vacant shifts. Denison also has concerns about the future of hours and work schedules within the department because a change is coming in August 2008. David has not required Jeanne to work without a break.

(Denison Decl. Ex. Z at 2.) Prior to the completion of Kaiser's investigation, on April 29, 2008, "Fisher sent out a reminder notice to his nursing supervisors as well as the staffing specialist and other managers under his scope of responsibility, indicating that they need to make certain their employees take lunches and breaks." (Denison Decl. Ex. Z at 3.)

On or about May 26, 2008, two coworkers discovered an envelope of cash that Denison taped to the back of her till locker. (Gibson Decl. Ex. A at 142; Fisher Dep. 117:14–121:25; Denison Dep. 100:3–25.) On June 11, 2008, Denison received a Level 1 Corrective Action for failing to report and account for all funds in violation of Kaiser's cash-handling policies. (Gibson Decl. Ex. A at 140–41; Denison Dep. 96:13–98:20.)

On June 23, 2008, Denison made her first request for FMLA leave. (Denison Dep. 113:16–116:11; Gibson Decl. Ex. A at 144–56; Denison Decl. ¶ 31.)

On July 7, 2008, coworkers discovered Denison's start-up fund envelope in an unlocked drawer at her reception desk in violation of Kaiser's cash-handling policies. (Gibson Decl. Ex A at 142; Denison Dep. 120:1–121:19.)

On July 12, 2008, Kaiser informed Denison she was "eligible for Family Leave as of *6/23/08*," thereby entitling her to 432

leave hours in the following twelve months. (Gibson Decl. Ex. A at 155–56.)

Denison was placed on Level 2 Corrective Action by Fisher on July 30, 2008, after a discovery meeting was held regarding the start-up fund envelope being left in an unlocked drawer on July 7, 2008. (Gibson Decl. Ex A at 157; Denison Dep. 119:4–121:19.)

Denison committed additional violations of Kaiser's policies in the fall of 2008. For example, on September 5, 2008, Fisher found unreported cash in Denison's till locker once again, and had Kaiser employee Sacha Woodward ("Woodward") attest to his findings. (Denison's Dep. 175:1–176:8; Gibson Decl. Ex. A at 167; Gibson Decl. Ex. B at 69.) In late October 2008, Peterson learned that Denison had placed the wrong patient wrist band on two separate patients she had checked into the Urgent Care. (Peterson Decl. ¶ 15; Gibson Decl. Ex. A at 168; Gibson Decl. Ex. C at 36; Peterson Dep. 101:6–105:16; 106:8–107:17.) Peterson's source was "a nursing supervisor who reported to Mr. Fisher that on two separate days a patient had been checked in and given the wrong identification wristband". (Peterson Supp. Decl. ¶ 5.) As part of the discovery into the incident, Peterson spoke personally with Sherry Socotch ("Socotch") from Kaiser's Medical/Legal Department. (Peterson Supp. Decl. ¶ 5.) Socotch informed Peterson that, "she had an incident report that had been filled out after the incident and sent to her office, but that because it contained confidential information, she could not let [him] see the document." (Peterson Supp. Decl. ¶ 5.) Instead, Socotch told Peterson over the phone *"that the incident report indicated that the error could have*

*caused the death of the affected patients."* (Peterson Supp. Decl. ¶ 5) (emphasis added).

On October 27, 2008, Fisher gave Denison a negative performance review, indicating that she continued to fail to meet expectations in areas, such as attendance, cash handling, communication with coworkers, critical thinking, interdepartmental relations, and teamwork. (Gibson Decl. Ex. B at 70–77; Denison Dep. 192:2–200:7; Fisher Dep. 260:17–265:8.)

On or about November 13, 2008, Denison left her key in her unlocked till locker in violation of Kaiser cash-handling policies. (Peterson Dep. 29:22–33:19; Denison Dep. 225:17–227:17; 229:3–25.) Denison's coworker, Megan Thurber ("Thurber"), had discovered the key and reported it to Fisher.[1] (Peterson Decl. ¶ 16; Denison Dep. 221:8–225:10.)

On or about November 20, 2008, Denison submitted a second FMLA request, which Kaiser approved on November 26, 2008. (Denison Dep. 234:19–235:4; Denison Decl. Ex. L.) Denison's November 20 request was merely a recertification of her earlier request on June 23, 2008. (Denison Decl. Ex. L.) Apparently no hours or days of leave were taken at that time.

A discovery meeting was held on December 2, 2008, addressing the wristband and till locker incidents. (Peterson Decl. ¶ 18, Ex. C–D.) Denison was issued a Level 3 Corrective Action for the till locker incidents.[2] (Peterson Decl. ¶ 18, Ex. C.) During the same discovery meeting, Denison received a Level 4 Corrective Action due to the wristband mixups, which Peterson "considered to be a very fla-

---

1. On February 5, 2009, Denison received a Level 1 Corrective Action for her behavior toward Thurber following the November 13, 2008 incident. (Denison Dep. 255:17–256:22; Gibson Decl. Ex. A at 221.)

2. It appears this was for two incidents, failing to report a cash transaction on September 5, 2008, and the till locker key issue of November 13, 2008. (Gibson Decl. Ex. A at 201; Peterson Decl. Ex. C.)

grant violation because she did it twice on two consecutive days, and while already on corrective action for cash-handling violations." (Peterson Decl. ¶ 18, Ex. D.) It is unclear if Peterson's reference to "while already on corrective action" was to the Corrective Actions on June 11, 2008, July 30, 2008, and/or to the first one received as a Level 3 on December 2, 2008. Although Denison received two Corrective Actions on the same day, Peterson states:

> I was aware that Mr. Fisher tried for several weeks in late October and November 2008 to schedule discovery meetings with Ms. Denison to investigate the wristband and till locker key incidents. Both Ms. Denison and her union representatives either refused to meet or appeared to have frequent scheduling conflicts. Coordinating the discovery meetings was additionally difficult because Ms. Denison worked a 3–day workweek, and only one of her days was during the week when her union representatives were available. Despite the logistical issues, by late November 2008 it became obvious that Ms. Denison and her union were simply 'stalling' holding the discovery meetings, because they knew she would be receiving additional corrective action resulting from the wristband and till locker key incidents.

(Peterson Decl. ¶ 17.)

Because Denison was issued a Level 4 Corrective Action, pursuant to the Day of Decision policy, she had to decide whether to voluntarily resign or create an immediate action plan "to correct her poor performance." (Peterson Decl. ¶ 19.) Denison was given until December 5, 2008, her next scheduled work day, to come up with an action plan. (Peterson Decl. ¶ 19.)

On December 5, 2008, Denison went on stress-related medical leave until January 4, 2009. (Denison Dep. 243:22–244:24; Gibson Decl. Ex. A at 209–12.)

On December 18, 2008, while Denison was on FMLA leave, Kaiser's Privacy and Security Compliance Manager, Rebecca Sherlock ("Sherlock"), received a call from Denison claiming that Fisher improperly accessed her HealthConnect medical record while investigating possible discipline related to her attendance. (Sherlock Decl. ¶ 6.) Sherlock investigated the complaint and it was determined that Fisher did access Denison's HealthConnect record "one time [in October 2008], when he viewed the appointments screen. From that appointment screen, Mr. Fisher could only view date and time information related to appointments.... No other information is displayed on that screen, and he could not have seen any other medical information or [protected health information] of Ms. Denison." (Sherlock Decl. ¶ 6.) Sherlock indicates that, if Fisher had accessed or viewed other portions of Denison's HealthConnect record, it would have shown up in the audit. (Sherlock Decl. ¶ 6.)

Sherlock concluded the investigation in mid-February 2009 and informed Peterson of her findings. (Sherlock ¶ 7.) Fisher had admitted to entering the appointments screen in Denison's HealthConnect record to confirm when she was at a medical appointment as part of an investigation into her attendance. (Sherlock Decl. ¶ 7.) As a result, on February 19, 2009, Fisher was issued a Level 2 Corrective Action for violating Kaiser's confidentiality policies, *i.e.,* accessing medical records without the specific purpose of providing medical care. (Sherlock Decl. ¶ 7.) Neither Sherlock nor Peterson informed Denison of their findings or the discipline handed down because such investigations are considered confidential under Kaiser's policies. (Sherlock

Decl. ¶ 8; Sherlock Dep. 27:24–29:4, 50:7–52:4; Gibson Decl. Ex. A at 223.)

When Denison returned to work, on or about January 5, 2009, Peterson was able to hold the Day of Decision meeting with her, along with Fisher, a Human Resource ("HR") representative, and Denison's union representative. (Peterson Decl. ¶ 20.) Denison decided to execute an action plan, but was informed "that she was on Level 4 Corrective Action and that *any further infractions, especially related to cash handling, could result in the termination of her employment.*" (Peterson Decl. ¶ 20) (emphasis added).

On or about March 24, 2009, Peterson learned that Fisher had discovered that Denison failed to properly deposit her end-of-shift cash bag into the safe the evening before. (Peterson Decl. ¶ 24.) Fisher informed Peterson that he discovered the bag hanging in the tumbler of the safe and had another MIS, Rebecca Macalanda ("Macalanda"), observe and witness the incident. (Peterson Decl. ¶ 24.) That same day, a discovery meeting was held with all of the pertinent parties. (Peterson Decl. ¶ 25; Gibson Decl. Ex. A at 170.) Peterson concluded that Denison "had probably engaged in another violation of cash-handling policies by failing to properly deposit the cash bag into the safe which violated the terms of her Level 4 Corrective Action and last chance agreement[;]" however, pursuant to Kaiser practice, Peterson investigated the matter further.[3] (Peterson Decl. ¶ 25.) Denison's coworker, Susan Tennant ("Tennant"), later informed Fisher that she was working with Denison on the night of March 23 and served as a witness with Denison when she deposited her cash bag at the end of the night.

(Peterson Decl. ¶ 26.) Denison claims the cash bag was not sticking out of the tumbler. (Denison Dep. 266:1–267:10.) Tennant claims "she double-checked and confirmed that Ms. Denison's cash bag had indeed dropped into the safe." (Peterson Decl. ¶ 26.)

On March 25, 2009, the Department of Health and Human Services' Office of Civil Rights ("OCR") notified Kaiser's Compliance Manager, Delores Empey ("Empey"), Denison filed a complaint based on Fisher accessing her HealthConnect appointment screen. (Sherlock Decl. ¶ 9; Gibson Decl. Ex. A at 226–27.) Pursuant to Compliance Department investigation practice, Sherlock turned over the file relating to the incident to Empey so she could respond to the OCR complaint. (Sherlock ¶ 9.) Empey sent the OCR a letter in response on March 30, 2009, noting that Denison's complaint had "been investigated and corrective action applied to the supervisor who accessed and used the complainants' medical appointment information." (Sherlock Decl. Ex. D at 1.) The OCR dismissed the charge soon thereafter. (Sherlock Decl. ¶ 9, Ex. E.)

In April 2009, Peterson reviewed the facts regarding the March 23 cash drop with his supervisor Leonard, her supervisor Tracy Runge ("Runge"), and various HR representatives. (Peterson Decl. ¶ 27, Ex. G; Peterson Dep. 112:3–114:15.) Peterson also approached the HR Manager, Shawn Ferguson ("Ferguson"), to discuss Denison's situation in April 2009. (Ferguson Decl. ¶ 3.) Based on Ferguson's "review and discussions with Mr. Peterson, it was obvious that Ms. Denison had failed to properly deposit the cash bag, that it was a

**3.** Peterson's declaration points out that it would be physically impossible for the bag to be in the tumbler if it had dropped into the safe "because the safe is a dual-custody safe that requires a member of the armored car company to be present to open the safe[,]" which is how Peterson "knew that no one could have taken Ms. Denison's cash bag out of the safe." (Peterson Decl. ¶ 26.)

violation of Kaiser's cash-handling policies, and also a violation of her Level 4 Corrective Action and last chance agreement." (Ferguson Decl. ¶ 3.)

On May 4, 2009, Peterson met with Ferguson, and Labor Relations Managers Mary Elizabeth Harper ("Harper") and Kevin Dull ("Dull") to determine whether Denison's employment should be terminated. (Peterson Decl. ¶ 27.) Peterson claims:

> After they had each independently reviewed the case, both Mr. Dull and Ms. Harper separately decided that Ms. Denison's employment should be terminated.... **Ms. Leonard and I discussed the case and, with HR's support, both made the decision to terminate Ms. Denison's employment, effective the following day, May 5.** The basis for the termination was Ms. Denison's violation of cash-handling policies while on a Corrective Action Level 4 primarily for earlier cash-handling violations. **Mr. Fisher helped provide factual information related to the events for which Ms. Denison was terminated, but he was not involved in making the final decision to terminate her employment.**

(Peterson Decl. ¶ 27) (emphasis added).[4]

Nate Taylor ("Taylor"), a HR consultant, did "not necessarily" think Denison should be terminated, but did recommend she be disciplined. (Taylor Dep. 38:8–15, 49:12–14; Ferguson Decl. ¶ 2.) Taylor does recall Harper recommending Denison be terminated. (Taylor Dep. 38:12–22.) However, Harper claims she "never told Mr. Ferguson, Mr. Taylor, Brad Peterson, David Fisher, or any other Kaiser manager or human resources employee that Jeanne Denison should be terminated or that Kaiser should terminate Jeanne Denison." (Harper Decl. ¶ 10.)

On May 5, 2009, prior to the start of her shift, Denison called Fisher to inform him she would be using her intermittent FMLA medical leave that day. (Denison Dep. 275:4–280:1; Denison Decl. ¶ 75.) Later that morning, Fisher called Denison saying he needed to speak with her, and Denison responded saying she was on sick leave and that it was inappropriate for him to contact her on a sick day, per Kaiser policy. (Denison Dep. 280:7–21; Denison Decl. ¶ 76.) About an hour later, Denison contacted her primary care provider about stress-related issues. (Denison Dep. 277:16–278:6, 280:22–281:1.) Soon thereafter, Denison received a telephone call from her shop steward, Mary Brooks ("Brooks"), indicating that she had been terminated. (Denison Dep. 281:2–21.) On or about May 11, 2009, Denison also received a letter from Fisher confirming the termination of her employment. (Denison Dep. 282:6–10.)

Denison filed a second complaint with OCR on July 17, 2009, alleging that Kaiser retaliated against her by terminating her employment in May 2009 because she filed a prior complaint with OCR. (Gibson Decl. Ex. I at 1.) OCR's Regional Manager, Linda Yuu Connor ("Connor"), informed Kaiser that:

> [I]nformation OCR obtained from interviews with several Kaiser supervisors and managers, along with documentation that complainant had been placed on several levels of corrective action from June 2008 to May 2009, indicates that complainant's dismissal was due to work performance issues.... Thus, OCR has concluded that there is insufficient information to establish a casual connection between the protected activity and the adverse action taken. Accordingly, OCR has concluded that the complainant

---

4. Ferguson also claims that both Dull and Harper "agreed that termination of Ms. Denison's employment was appropriate." (Ferguson Decl. ¶ 3.)

has not established a claim of retaliation[.]

(Gibson Decl. Ex. I at 1.) [5]

### Legal Standard

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.,* 343 F.3d 1107, 1112 (9th Cir.2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir.1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted).

### Preliminary Procedural Matters

Pursuant to Rule 6(b)(1)(B), Denison has moved the court for an order enlarging the time for filing an Answer to the counterclaims asserted by Kaiser. (Docket No. 85.)

On November 19, 2010, Kaiser served its first request for production. (Snyder Am. Decl. ¶ 6.) Denison's counsel (hereinafter, "Snyder") delivered a disc containing all the records Denison had in her possession that related to Kaiser's request on February 21, 2011. (*Id.* ¶ 7.) Soon thereafter, on February 28, 2011, Snyder received a call from Kaiser's counsel (hereinafter, "Kitchel," "Alifanz," or "Pederson") claiming a Health Insurance Portability and Accountability Act ("HIPAA") violation. (*Id.* ¶ 7.) Specifically, Kitchel informed Snyder that

---

**5.** Denison filed a charge with the Oregon Bureau of Labor and Industries ("BOLI") on September 30, 2009. (Gibson Decl. Ex. A at 230–33). BOLI dismissed the charge and is-

sued a right-to-sue letter to Denison on or about September 1, 2010. (First Amended Complaint ("FAC") ¶ 3.)

among the February 21 production were records that disclosed HIPAA protected health information. (*Id.* ¶ 7.) Kitchel told Snyder that Denison could be exposed to personal and/or criminal liability. (*Id.* ¶ 8.)

On March 3, 2011, Snyder wrote Alifanz, stating that "all paper records that could be interpreted to contain protected health information were being delivered, and that all electronic copies containing the same would be destroyed." (*Id.* ¶ 9.) In accordance with the March 3 letter, Snyder delivered all bates stamped documents that could be interpreted as HIPAA protected information; his office shredded non-bates stamped versions of those records; and all electronically scanned versions of those records were destroyed. (*Id.* ¶ 9.)

On April 12, 2011, based on an unopposed motion for leave to file an amended answer,[6] "Kaiser amended its answer alleging a new Fifteenth Affirmative Defense of after acquired evidence, and pleading that it learned Denison 'took' and 'provided' documents containing 'protected health information.'" (*Id.* ¶ 10.) Kaiser's amended answer also set forth a counterclaim seeking monetary damages for time incurred in "complying with the legal obligations resulting from" Denison's breach of her confidentiality, and the "second counterclaim reasserts the allegations of the new Fifteenth Affirmative Defense, seeking a declaration that plaintiff's damages 'must cut off as of the date that termination would have occurred.'" (*Id.* ¶ 10.)

As Kaiser points out, Snyder's answer to their counterclaims was due 21 days later on May 3, 2011. (Kaiser's Resp. Pl.'s Mot. Enlarge at 2.) Snyder does not dispute this fact, rather Snyder says he did not "file a reply to the Fifteenth Affirmative Defense (or the other 14 affirmative defenses), and likewise believed that he did not need to reply to, or answer, the counterclaims alleging the same conduct." (Snyder Am. Decl. ¶ 11.) Snyder now realizes that he should have answered the counterclaims within 21 days of April 12, 2011. (*Id.*) Apparently, Snyder "was of the mistaken view that [Denison] would set out her contentions disputing the Fifteenth Affirmative Defense and counterclaims in the parties' Pre Trial Order." (*Id.* ¶ 17.)

On August 29, 2011, Kaiser filed its motion for summary judgment, wherein it affirmatively sought summary judgment on its two counterclaims, pointing out that the allegations in its counterclaims should be deemed admitted because Snyder never filed an answer to those counterclaims. (Pedersen Decl. ¶ 4.) Notably, in Denison's October 15, 2011 response to Kaiser's motion, Snyder argued that a party is not required to file an answer to a counterclaim under Rule 8(b)(6). (*Id.* ¶ 5.) In its November 2, 2011 reply brief, Kaiser stated that a response to a counterclaim is required under the Rules and reiterated the argument that the allegations in its counterclaims should be deemed admitted. (*Id.* ¶ 6.) On that same day, "Snyder realized that an Answer needed to be filed denying Kaiser's counterclaims" and "immediately tried to confer with" Pederson. (Snyder Am. Decl. ¶ 17.)

Snyder left messages for Pederson that day and the next, seeking a stipulation to Denison's filing of an answer to Kaiser's counterclaims, due to his "oversight." (Pederson Decl. ¶ 7, Ex. A.) Pederson responded to Snyder on November 3 via

---

**6.** On August 15, 2011, pursuant to another unopposed motion for leave to file an amended answer, Kaiser filed its Second Amended Answer, Affirmative Defenses and Counterclaims. (*Id.* ¶ 14.) The alterations Kaiser made were unrelated to its April 12 amendment. (*Id.*)

email, stating that she was out of town and would consider his request, but "wanted to know more about the reason why he did not file an answer." (*Id.* ¶ 8.) Snyder responded on November 4, stating, "[a]t the time, I didn't think an Answer was necessary." (*Id.* ¶ 9.) Pederson responded on November 7, stating she "did not understand his position that an answer was not required, as the pleading rules unambiguously required an answer, and that, at any rate, he should [not] have made his request two months after the issue was first raised in Kaiser's motion for summary judgment." (*Id.* 11.) Snyder responded a short time later, stating he "was not involved in the summary judgment response;" that he "had not read" Kaiser's motion for summary judgment; that he does not file answer to counterclaims "in all cases;" and that "[m]ost of the time, a Pre Trial Order is prepared which summarizes the pleadings." (*Id.*, Ex. B.)

Under Rule 6(b)(1)(B), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made *after* the time has expired if the party failed to act because of *excusable neglect.*" FED.R.CIV.P. 6(b)(1)(B) (emphasis added). In *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253 (9th Cir.2010), the Ninth Circuit recognized that Rule 6(b)(1), "like all the Federal Rules of Civil Procedure, is to be *liberally* construed to effectuate the general purpose of seeing that cases are tried *on the merits.*" *Id.* at 1258–59 (internal quotation marks, citation, and alteration omitted) (emphasis added). While litigants will normally be granted an enlargement of time in the absence of bad faith or prejudice to the adverse party, "[e]ven when the extension is sought *after the time limit has expired,* the good cause standard is satisfied merely upon a showing of excusable neglect." *Cal. Trout v. F.E.R.C.,* 572 F.3d 1003, 1027 n. 1 (9th Cir.2009) (emphasis added).

In *Pioneer Inv. Serv. Co. v. Brunswick Assocs.,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court stated:

> Although inadvertence, *ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept'* and is not limited strictly to omissions caused by circumstances beyond the control of the movant.

*Id.* at 392, 113 S.Ct. 1489 (emphasis added). In determining whether neglect is excusable, the court considers four factors: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Bateman v. U.S. Postal Serv.,* 231 F.3d 1220, 1223–24 (9th Cir.2000).

Snyder's apparent oversight, or misinterpretation, was is in regards to Rule 12(a)(1)(B), which provides that, "[a] party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim." FED.R.CIV.P. 12(a)(1)(B). Courts have reached varying conclusions when faced with a litigant's failure to comply with Rule 12(a)(1). For example, in *Parma Cmmty. Gen. Hosp. v. Premier Anesthesia,* No. 1:09–CV–325, 2011 WL 108891 (N.D.Ohio Jan. 12, 2011), the court found that a "short delay in filing" an answer to counterclaims constituted excusable neglect when there was no allegation of prejudice to the adverse party or bad faith by the plaintiff, and the proceedings were not impacted. *Id.* at *2.

By contrast, in *Allstate Ins. Co. v. Administratia Asigurarilor,* 163 F.R.D. 196 (S.D.N.Y.1995), the court found no excusable neglect where counsel did not adhere to Rule 12(a)(1)(A)'s limit for filing an an-

swer. In so holding, Allstate stated, "defense counsel's failure to understand the plain language of the Federal Rules of Civil Procedure does not constitute excusable neglect." *Id.* at 198 (citations omitted). However, Allstate also found it "painfully clear" that defense counsel's performance had been "appalling" and ordered her to appear "to show cause why th[e] Court should not impose Rule 11 sanctions[.]" *Id.* at 200.

■ As the Supreme Court has recognized, "Rule 6(b) gives the court *extensive flexibility* to modify the fixed time periods found throughout the rules, whether the enlargement is sought before or after the actual termination of the allotted time." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 906 n. 7, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (internal quotation marks and citation omitted) (emphasis added). I find that Snyder satisfied the Rule 6(b)(1) standard for obtaining an extension of time.

■ Even "when an actor *knowingly* misses a deadline but acts in good faith without any intention to prejudice the opposing party, manipulate the legal process, or interfere with judicial-making, the actor's delay is neglectful, but not intentional, and thus may be excusable." *Golf Sav. Bank v. Walsh*, No. 09–973–AC, 2010 WL 3222112, at *5 (D.Or. Aug. 13, 2010) (emphasis added). There is no dispute that Snyder has acted in good faith and lacked any intention to prejudice Kaiser. Snyder's good faith in this proceeding is demonstrated by his routine extension of normal courtesies to his adversary, which contributed to Kaiser's April 12 addition of counterclaims.

The only prejudice Kaiser points to is the fact that Snyder's motion "is nearly *seven months late,* and comes long after the close of discovery (on July 10) and after all summary judgment briefing, including that related to Kaiser's counterclaims has been completed." (Kaiser's Resp. Pl.'s Mot. Enlarge at 3.) However, I assign this consideration little weight because, according to Kaiser, at *"no time during discovery* did Plaintiff dispute" the principle focus of their counterclaims, *e.g.,* whether Denison's "conduct breached her obligations under *Kaiser's confidentiality policies,* and that Kaiser would have terminated Plaintiff's employment immediately had its Compliance Department learned of her conduct." (*Id.*) (emphasis added). Considering the apparent strength of Kaiser's counterclaims on their merits, and the fact that Snyder's motion to enlarge is being considered in conjunction with Kaiser's motion for summary judgment, I foresee little, if any, prejudice or negative impact on this proceeding.

Because Snyder acted in good faith, without prejudice, and with minimal impact on this proceeding, his neglect was excusable. Accordingly, Denison's Motion (Docket No. 85) to Enlarge Time to File Answer to Counterclaims should be granted. With a responsive pleading having been filed, the allegations in Kaiser's counterclaims should be addressed on their merits rather than deeming them admitted under Rule 8(b)(6).

### Discussion

### I. Kaiser's Motion (Docket No. 47) for Summary Judgment

Denison alleges statutory claims against Kaiser, for violation of the federal Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, and its state law counterpart, the Oregon Family Leave Act ("OFLA"), ORS 659A.150–.186. Denison also alleges state common law claims for wrongful termination and invasion of privacy. Her final claim alleges whistleblower retaliation under ORS 659A.199.

Invasion of privacy is the only claim alleged against Fisher personally and Kaiser. Because Denison's invasion of priva-

cy claim against both Fisher and Kaiser are predicated upon the same underlying conduct, Kaiser has joined in Fisher's motion for summary judgment and supporting memoranda. (Kaiser's Mem. Supp. at 32.) Accordingly, Kaiser's motion against Denison's invasion of privacy claim will be addressed below with Fisher's motion for summary judgment.

## A. FMLA

Pursuant to 29 U.S.C. § 2615(a), there are two distinct theories for recovery on FMLA claims, that is, (1) the "retaliation" or "discrimination" theory and (2) the "entitlement" or "interference" theory. *Sanders v. City of Newport,* 657 F.3d 772, 777 (9th Cir.2011).

■ Denison's FMLA claim is brought under the interference/entitlement theory only. (Mot. Summ. J. Hr'g Tr. 50, Dec. 5, 2011) ("We only have an interference claim.") An interference claim is based on an alleged violation of § 2615(a)(1), which states, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" the substantive rights guaranteed by FMLA. 29 U.S.C. § 2615(a)(1). Section "2615(a)(1) applies to employees who simply take FMLA leave and as a consequence are subjected to unlawful actions by their employer." *Xin Liu v. Amway Corp.,* 347 F.3d 1125, 1134 n. 7 (9th Cir. 2003).

■ This circuit does *not* apply the burden shifting framework delineated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to FMLA interference claims.

*Sanders,* 657 F.3d at 778. Instead, the plaintiff-employee can "prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Id.* (citation omitted). "The employee must establish that: (1) she was eligible for FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Sanders,* 657 F.3d at 778 (citing *Burnett v. LFW Inc.,* 472 F.3d 471, 477 (7th Cir.2006)).[7]

■ When "an employer defends against an interference claim," he must demonstrate "a legitimate reason to deny an employee reinstatement." *Id.* at 779–80; *see also Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 508 (6th Cir.2006) ("Both the statute and the DOL regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.")

DOL regulation 29 C.F.R. § 825.216(a) provides, in pertinent part, that, "if an employee is laid off during the course of taking FMLA leave ... [the] employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." 29 C.F.R. § 825.216(a)(1).

■ The Ninth Circuit has recognized this limitation, stating, "[a]lthough the

---

7. Within her complaint, Denison alleges that, "Defendant Kaiser interfered ... against Plaintiff for taking and/or requesting medical leave by taking adverse employment actions against Plaintiff, including, but not limited to, intermediate discipline and then terminating her employment with Defendant Kaiser."

(FAC ¶ 55.) Whether Denison is attempting to proceed on the theory that Kaiser failed to reinstate her following FMLA leave or used the taking of FMLA leave as a negative factor in any employment action, her claim is only an "interference" claim.

FMLA generally confers the right to reinstatement, an employer may still terminate an employee during her leave if the employer would have made the same decision had the employee not taken leave." *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1097 (9th Cir.2007) (citing 29 U.S.C. § 2614(a); 29 C.F.R. 825.216(a)(1)). That is to say, the employee is terminated for conduct unrelated to FMLA leave. *Sanders*, 657 F.3d at 779. The obvious implication being that an employer is precluded from using FMLA leave as a "negative factor" in reaching its decision to terminate. *See* 29 C.F.R. § 825.220(c) (noting that, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").

██ Here, there are no material facts which are genuinely disputed. Whether Denison's claim is analyzed as alleging Kaiser interfered with Denison's rights under the FMLA, either by denying or discouraging her from using leave, by disciplining her, or by considering her use of leave as a negative factor in her termination, Kaiser has presented evidence indicating that Denison's employment record, when viewed as a whole, shows a long history of objective complaints and discipline.

██ As an initial matter, it is noteworthy that Denison brings this action pursuant to § 2615(a)(1), the provision governing interference with substantive rights. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir.2001) ("holding that a claim by a former employee that he was denied use of FMLA leave is a claim of substantive right, covered under [§ 2615](a)(1), and not (a)(2)" (citing *Diaz v. Ft. Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir.1997))). As *Diaz* explained, FMLA substantive right claims " 'do not depend on discrimination' " since the issue is " 'not that the employer treated one

employee worse than another' but that every employee has substantive rights under FMLA that the employer must respect." *Amway*, 347 F.3d at 1136 (quoting *Diaz*, 131 F.3d at 712).

██ Setting forth the timeline of events leading to Denison's termination is instructive. With the caveat that "an employer is not required to cease pursuing a disciplinary course of action against an employee that began before that employee took FMLA leave, simply because that employee took leave." *Swan v. Bank of Am.*, 360 Fed.Appx. 903, 906 (9th Cir. 2009). The relevant pretermination events were:

- July 18, 2007, Denison's performance evaluation from her previous supervisor, Wood, indicated Denison "occasionally has difficulties with communication, particularly with her coworkers. [Some] occasional patient complaint[s]."

- In late July 2007, Fisher becomes Denison's supervisor.

- October 19, 2007, Denison receives a performance evaluation from Fisher that indicated she had communication and teamwork issues.

- November 25, 2007, Leonard filed a complaint against Denison which indicated that she was "not pleasant" to a patient and failed to collect pertinent billing information. Leonard's complaint led to a Level 1 Corrective Action being issued to Denison on December 7, 2007.

- January 2008, Kaiser implements cash-handling policy imposing greater responsibilities on each MIS.

- February 25, 2008, Fisher sent Denison an email indicating that her cash drawer balancing was off "too often."

- March 23, 2008, Denison contacted Kaiser's Compliance Hotline to re-

port that Fisher was not giving her breaks during twelve hour shifts.

- On or about May 26, 2008, Trinette Talamantes and Erin Padden discovered unreported cash transactions that had been in Denison's till locker for a couple months.[8]

- June 11, 2008, Denison received a Level 1 Corrective Action for the May 26, 2008 unreported cash transaction in her locker.

- June 23, 2008, Denison made her first request for FMLA leave.[9]

- July 7, 2008, Rita Townley discovered Denison's start-up fund was left at her desk in violation of Kaiser's cash-handling policies. As a result, Denison received a Level 2 Corrective Action on July 30, 2008.

- On July 12, 2008, Kaiser informed Denison she was "eligible for Family Leave as of *6/23/08*," thereby entitling her to 432 leave hours in the following twelve months.

- September 5, 2008, Fisher found unreported cash in Denison's till locker and had Woodward confirm his finding.

- In October 2008, Fisher accessed Denison's HealthConnect record.

- October 27, 2008, Fisher gives Denison a negative performance review, indicating that she continued to fail to meet expectations in several areas, including cash handling.

- In late October 2008, Peterson learned from Fisher that Denison

had placed the wrong patient wrist band on two separate patients she was checking into the Urgent Care on October 26 and 2007, 2008.[10]

- November 13, 2008, Thurber discovers Denison left her key in her unlocked till locker.

- November 20, 2008, Denison submitted a FMLA recertification request which was approved by Kaiser on November 26, 2008.[11]

- December 2, 2008, the parties schedules finally align in order for a discovery hearing to take place regarding the September 5 and November 13 till locker incidents, and the wristband mixups on October 26 and 27. Denison is issued Level 3 and 4 Corrective Actions, respectively. Denison is given until December 5, 2008, her next scheduled work day, to come up with an action plan pursuant to Kaiser's Day of Decision policy.

- December 5, 2008, Denison takes one-month of FMLA leave.

- December 18, 2008, Denison complains to Kaiser's Privacy and Security Compliance Manager that Fisher improperly accessed her HealthConnect medical record.

- January 5, 2009, rather than resign, Denison created an action plan and agreed to a last chance agreement.

- March 24, 2009, Fisher discovers Denison's cash bag hanging in the tum-

8. (Denison Dep. 98:21–102:14.)

9. It is not entirely clear when, or if, Denison took FMLA after making this request. Kaiser's response on July 12, 2008, seems to indicate that it was only an eligibility determination.

10. According to Peterson, despite Denison's denial, "[b]ased on my investigation and

based on the discovery meeting with [Denison], I was convinced that [Denison] had, indeed, failed to put the correct wrist band on those patients." (Peterson Supp. Decl. ¶ 6; Gibson Decl. Ex. A at 168.)

11. The record suggests that Denison's November 20 request was merely a recertification and that she did not, in fact, take FMLA leave until December 5, 2008.

bler of the safe and has Macalanda serve as a witness.[12]

- March 25, 2009, OCR notified Empey that Denison had filed a complaint based on Fisher accessing her HealthConnect appointment screen in October 2008.
- May 4, 2009, Peterson and Leonard decide to terminate Denison's employment effective May 5, 2009.
- May 5, 2009, Denison takes one-day medical leave before she claims to have been notified of her termination.

The gist of Denison's claim is that she had a stellar employment history and, upon becoming her supervisor, Fisher began targeting her with frivolous disciplinary measures only after she gave notice of her intent to take FMLA-related leave. This record does not support such allegations.

Kaiser concedes that Denison: (1) disputes whether she placed the wrong patient wristbands on two patients in October 2008, which formed one of the bases for her Level 4 Corrective Action; and (2) disputes that she improperly deposited her cash bag on March 23, 2009. Kaiser argues these disputes are not material disputes of fact precluding summary judgment. I agree.

In *Denny v. Union Pac. R. Co.*, 173 Fed.Appx. 549 (9th Cir.2006), the employee had brought an FMLA interference claim and disputed the events underlying the incident which led to his termination. *Id.* at 550. *Denny* appropriately observed that the question is only whether the employer fired him based on their assessment of the terminable offense, "rather than for a reason prohibited by the FMLA." *Id.* at 551 ("noting that it is unimportant whether the employer's otherwise permissible rea-sons for a termination were wrong, so long as it honestly believed them" (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.2002))).

Even viewing the evidence in the light most favorable to Denison, her supervisor prior to Fisher gave her a performance evaluation which indicated that she had difficulties communicating with co-workers and was the subject of some "patient complaint[s]." Additionally, Leonard's complaint, which involved cash handling procedure, came in November 2007 and resulted in a Corrective Action. Within six months of Kaiser implementing its new cash handling policy in January 2008, Denison had two more cash handling problems, one of which resulted in another Corrective Action, all prior to her first FMLA leave request. Thereafter, she had four more cash handling problems and the two wrist band incidents. Given the fact that Denison received warnings, training, and discipline prior to requesting FMLA leave, and that these problems continued unabated thereafter, coupled with her being given every FMLA leave she requested, no reasonable juror could conclude that the Corrective Actions resulted from her use of FMLA leave.

Denison claims that "the timing of the discipline meted out" to her is "uncanny." However, it inescapable that each of her requests for FMLA leave were preceded by various Kaiser employees, most often not Fisher, disclosing and/or discovering her cash handling policy violations. In October 2007, Denison signed a Cash Handling Agreement and she has testified that cash handling was essential to the performance of her MIS duties. That agreement indicates that:

> The purpose of this cash handling responsibility agreement is to confirm in

---

12. Because the safe is dual-custody, Peterson knew that "no one could have taken Ms. Denison's cash bag out of the safe." (Peterson Decl. ¶ 11.)

writing that you are informed of, and understand, the Northwest Medical Operations Business Services Cash Handling Policies and Procedures and that you are aware of your responsibilities.

\* \* \*

[F]ailure to follow these guidelines, *even without demonstration of actual loss,* shall result in the utilization of the Issue Resolution Corrective Action process up to and including termination.

(Gibson Decl. Ex. 9) (emphasis added). The policy seems clear. The gravity of the harm that results has no bearing on whether a violation should result in discipline. It is not a situation where "no harm equals no foul" as Denison alleges.[13]

It is true that, despite being on a last change agreement, Taylor believed Denison should be disciplined, but "not necessarily" terminated, and Harper claims she did not support the decision to fire her.[14] Nonetheless, Labor Relations Manager Dull and HR Manager Ferguson's assessments have not been contradicted, nor has the fact that Peterson and Leonard, the ultimate decision makers, thought termination was warranted.

It is significant that Peterson and Leonard made the decision to terminate Denison before she sought leave on May 5. In *Santrizos v. Evergreen Fed. Sav. and Loan Assoc.,* No 06–886–PA, 2007 WL 3544211 (D.Or. Nov. 14, 2007), the defendants argued, amongst other things, that they were entitled to summary judgment on plaintiff's FMLA interference claim since he was terminated for reasons independent of his request for leave. *Id.* \*5–7. Citing *Gambini,* Judge Panner determined that, even if defendant altered plaintiff's

effective termination date "because he requested leave, defendants have shown that the decision to terminate plaintiff was made *before* and *independently* of plaintiff's request for medical leave." *Id.* at \*7 (emphasis added).

In short, the FMLA's anti-interference provision bars conduct that "tends to chill" an employee's willingness to exercise their rights. *Bachelder,* 259 F.3d at 1124. Nothing in the record supports the fact that Kaiser interfered with or restrained Denison's freedom to exercise her substantive rights. Accordingly, Kaiser is entitled to summary judgment on Denison's FMLA claim.

**B. OFLA**

Because the parties agree Denison's OFLA claim is subject to the same analysis as her FMLA claim pursuant to ORS 659A.186(2), my analysis of Denison's FMLA claim applies equally to her OFLA claim.[15] *See also Sanders,* 657 F.3d at 783 (noting similarities between OFLA and FMLA reinstatement rights, which makes it proper to apply the same legal standards under FMLA to an OFLA claim).

**C. Wrongful Discharge**

Denison has also asserted a claim for wrongful discharge based on two theories: (1) that she was wrongfully terminated for exercising an employment related right to take medical leave; and (2) that she was discharged for reporting that her HealthConnect record was accessed in violation of HIPAA. (Pl.'s Resp. at 37.)

Wrongful discharge claims require the presence of a "causal connection be-

---

**13.** (*But see* Pl.'s Mem. at 23) ("No money was missing, and no harm was alleged by anyone.")

**14.** Taylor, like Peterson and Ferguson, says Harper recommended Denison's termination.

**15.** (Pl.'s Mem. at 25; Kaiser's Mem. Supp. at 20.)

tween a protected activity and the discharge." *Estes v. Lewis and Clark Coll.,* 152 Or.App. 372, 381, 954 P.2d 792 (1998). The employee's protected activity must have been a "substantial factor" in the decision to terminate the employee, e.g., the employer's wrongful purpose must have been a factor that made a difference in the discharge decision. *Id.* (citation and quotation marks omitted).

■ Here, Kaiser fired Denison for repeated failures to comply with company policy. It is undisputed that, prior to filing her internal hotline or OCR complaint, Denison had accumulated a sufficient number of Corrective Actions to be placed on a last chance agreement, thus requiring her to choose between resigning or creating an action plan. Kaiser also did not receive notice of Denison's OCR complaint until after she violated her last chance agreement. There is no evidence from which a jury could find that any protected activity was a "substantial" contributing factor in Denison's termination. Nor is there an issue of fact whether Kaiser interfered with Denison's rights under FMLA. Thus, Kaiser is entitled to summary judgment on Denison's wrongful discharge claim. *See Santrizos,* 2007 WL 3544211, at *8 (similarly resolving summary judgment on FMLA interference and wrongful discharge claim).

### D. Whistleblower Retaliation

■ Denison's cause of action for whistleblower retaliation is premised on her reporting that Fisher and Thurber impermissibly accessed her HealthConnect record. (FAC ¶¶ 96–97.) [16]

In Oregon, "[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to ... conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law[.]" OR.REV.STAT. § 659A.199(1).

At the summary judgment stage, Denison must demonstrate the existence of facts from which a reasonable factfinder could conclude that she engaged in protected activity and that Kaiser retaliated against her in response to that activity. *Merrill v. M.I.T.C.H. Charter Sch. Tigard,* 2011 WL 1457461, at *7 (D.Or. Apr. 4, 2011) ("[I]f the employer asserts a non-discriminatory reasons for the employee's termination, the plaintiff must show that the employer would not have made the same decision absent a discriminatory motive." (citing *El–Hakem v. BJY Inc.,* 415 F.3d 1068, 1076 (9th Cir.2005))).

In *Franklin v. Clarke,* 2011 WL 4024638 (D.Or. Sept. 9, 2011), there was evidence that employee would not have been terminated "but for" the protected activity at issue, which demonstrated "that Defendants' reason for terminating Plaintiff was pretextual." *Id.* at *10. The converse is true here. Again, it is undisputed that Denison compiled a sufficient number of Corrective Actions to be placed on a last chance agreement prior to any HIPAA complaint. And in any event, Peterson and Leonard, whose motives have not been questioned, made the decision to terminate Denison based on her disciplinary history. No reasonable trier of fact could conclude Kaiser would not have made the same decision absent a discriminatory motive.

---

**16.** Denison "is not asserting any claims for retaliation for asserting wage claim violations. She's not alleging a claim for retaliation follow[ing] testifying in a workers' compensation hearing;" rather "she was whistleblowing regarding [Fisher] accessing her medical records[.]" (Hr'g Tr. 35.)

Accordingly, Kaiser is entitled to summary judgment as to Denison's whistleblower retaliation claim.[17]

### E. Kaiser's Counterclaims

It is undisputed that Denison kept a binder in her locker containing hundreds of records on over 700 Kaiser members, and had her daughter remove this binder to her home after being terminated. (Denison Dep. 49:20–61:19; Peterson Dep. 135:20–137:5, 145:14–147:1, 154:2–155:14; Sherlock Decl ¶¶ 11–13.) The records included individually identifiable PHI under Kaiser's confidentiality policies, including medical record numbers and identifying information, credit card numbers, and payment information. (*Id.*) Regardless of whether others ever viewed or used the documents, the mere copying and removal may have constituted violations of Kaiser's confidentiality policies because employees may not access, copy, remove, or disclose PHI without a job-related reason relating to providing care to that patient. (Sherlock Decl. ¶¶ 2–4, 13.)

As a result, Kaiser counterclaims for (1) damages resulting from Denison's breach of the confidentiality agreement, and (2) a declaratory judgment that Denison's damages are cut off from the date of her breach. (Am. Answer ¶¶ 60–63.)

 Kaiser claims Denison "was bound by the Confidentiality Agreement she signed (P. Dep. Ex.6), which plainly creates contractual obligations for" Denison. (Kaiser's Mem. Supp. at 32.) Exhibit 6 is a confidentiality agreement Denison signed on March 15, 2007, which provides, "[i]f I violate the agreements in this document, I will be breaking my obligations to Kaiser Permanente I may face corrective action. This may include losing my job, having my contract or other relationship terminated,

or other consequences allowed by the law." (Sherlock Decl. Ex. B at 2; Gibson Decl. Ex. A at 67–68.)

In support of its position, Kaiser cites *Fleming v. Kids & Kin Head Start*, 71 Or.App. 718, 693 P.2d 1363 (1985) and *Simpson v. W. Graphics Corp.*, 293 Or. 96, 643 P.2d 1276 (1982), for the proposition that an "employer's unilaterally adopted policies can create binding contractual obligations for employee[ s]." (Kaiser's Mem. Supp at 32.) Neither case demonstrates that Kaiser is entitled to summary judgment on its breach of contract theory.

In *Fleming*, the issue on appeal was the sufficiency of the complaint. *Fleming*, 71 Or.App. at 720, 693 P.2d 1363. The plaintiff-employee alleged "that defendant terminated her employment without just cause, in violation of a provision of its employee handbook *which was part of her contract of employment.*" *Id.* (emphasis added). Similarly, in *Simpson*, the parties agreed that the terms of an employee handbook were contractual terms of the plaintiffs' employment. *Simpson*, 293 Or. at 99–100, 643 P.2d 1276. Like *Fleming*, *Simpson* was primarily concerned with issues involving a just cause provision in an employment contract. *Id.* at 100, 643 P.2d 1276.

Denison has stated, "my employment was subject to a collective bargaining agreement between my union and Kaiser. I know of no other employment contract that I entered into with Kaiser." (Denison Decl. ¶ 5.) Denison's counsel represented during oral argument that the confidentiality agreement is

> simply a document that Ms. Perez Denison was asked to sign with a ton of other documents that were routinely signed.

---

**17.** Based on the insufficiency of Denison's claim on its merits, I decline to address

whether ORS 659A.199 applies retroactively.

There is no evidence that it was bargained for. In fact, Ms. Perez Denison was subject to a collective bargaining agreement. There is no evidence [that] the confidentiality agreement was part of the collective bargaining agreement. In fact, it looks like it's outside of that collective bargaining agreement.

(Hr'g Tr. 30.) However, nothing in the record indicates whether the March 2007 confidentiality agreement was, or was not, part of the collective bargaining agreement, or any other alleged employment contract.

■ In any event, it is well settled that Oregon subscribes to the objective theory of contracts, which means

> that whether the parties entered into an agreement does not depend on whether the parties had the same subjective understanding of their agreement, that is, on whether their 'minds met' on the same understanding. Rather, it depends on whether the parties agreed to the same, express terms of the agreement, and on whether those terms constitute an enforceable agreement.

*City of Canby v. Rinkes*, 136 Or.App. 602, 902 P.2d 605, 610 (1995).

At the outset, I must point out that Kaiser relies on cases which are factually distinguishable from this case. Neither *Fleming* nor *Simpson* involved a breach of contract claim brought by the employer against the employee. These cases better support the proposition that an employer's unilaterally adopted policies can create binding contractual obligations for the employer, not the employee.

Here, Denison had previously signed a Confidentiality Statement on January 13, 1999, which generally prohibited disclosures similar to that of the March 2007 Confidentiality Agreement. While the Confidentiality Statement referenced the fact that an employee could be terminated for violating its terms, it made no mention

of being able to impose "other consequences allowed by the law." The "modification" of the form in 2007 by Kaiser is not, when viewed objectively, an enforceable contract from which consequential damages may flow.

Simply put, this record does not suggest the two forms of confidentiality agreement were intended as objective manifestations of a contract by which Denison agreed not to disclose the information. Likewise the record recites no consideration for such an agreement. This contract formation issue is a question of law. *Real Estate Loan Fund v. Hevner*, 76 Or.App. 349, 355, 709 P.2d 727 (1985). I find that no contract has been formed. Objectively what this amounts to is an employer getting an employee to acknowledge he or she has been advised of one of the policies or rules they must observe as employees. There is no manifestation of a contractual agreement to subject oneself to damages claimed by the employer for a violation.

Even if one could say a contract was formed, there is no objective manifestation of an agreement to be liable for consequential damages. Again the terms of the alleged contract are an issue of law. *Kabil Developments Corp. v. Mignot*, 279 Or. 151, 156–58, 566 P.2d 505 (1977). At the very best for Kaiser, its document is ambiguous and I construe it against Kaiser on this issue.

In summary, Kaiser's motion for summary judgment as to their counterclaim for damages resulting from Denison's alleged breach of the confidentiality agreement should be denied. I need not address whether Denison's damages would be cut off under the after-acquired evidence doctrine, because (1) all claims stemming from Denison's termination should be dismissed; and (2) Denison's invasion of privacy claim does not implicate the after-acquired evidence doctrine.

## F. Evidentiary Objections

Kaiser has objected to several portions of seven of the declarations Denison offers in support of her response to Defendants' motions for summary judgment. Kaiser specifically objects to the Tennant Declaration; the Lindgren Declaration; Paragraphs 9 and 17–20 of the Brooks Declaration; Paragraphs 6, 8, 10–14, and 18 of Danielle Denison's Declaration; Paragraphs 10–13 of the Leach Declaration; and Paragraphs 7–9 of the Harper Declaration. (Kaiser's Objection Pl.'s Evidence ("Kaiser's Objections") (Docket No. 82) at 5–7.) Kaiser also alleges that Paragraphs 1–22, 27–28, 36–38, 45–51, 55–59, and 65–78 of Denise Denison's Declaration are irrelevant. (Kaiser's Objections at 8.)

■ While Kaiser is specific in some instances, a majority of their objections are extremely broad and lack any meaningful clarity. Kaiser claims that "most" or "the vast majority" of every declaration "is inadmissible, because the statements are irrelevant, based on hearsay, vague and nonspecific, and lack foundation or are not based on first-hand knowledge." (Kaiser's Objections at 5–8.) As Denison's counsel points out:

> Defendant Kaiser presents no specific evidentiary objection to any discrete statement made by any of the witnesses in their declarations. Instead, defendant Kaiser elects to make conclusory objections that 'most' of their declarations are inadmissible for various reasons without bothering to point the Court or Plaintiff to portions of the declarations are objectionable for which reasons. All witnesses provided declaration testimony based upon their personal knowledge, the testimony is relevant and probative, thus, the Court should consider it.

(Pl.'s Resp. Defs.' Evidentiary Objections (Docket No. 83) at 6.)

I agree with Denison's counsel and will not address any broad or non-specific objection. *See Melendez v. Morrow County Sch. Dist.,* Civ. No. 07–875–AC, 2009 WL 4015426, at *9 (D.Or. Nov. 19, 2009) (declining "to sift through the extensive material cited and speculate as to what material is objectionable and which objection Defendants wish to apply to a particular piece of evidence."); *see also Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 579 (2d Cir.1969) (recognizing that a party "should state specifically the portions of the affidavit to which objection is being made," rather than "swing its bludgeon wildly.")

■ While I am mindful of the fact that "[d]efects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection," *FDIC v. N.H. Ins. Co.,* 953 F.2d 478, 484 (9th Cir.1991) (citation and quotation marks omitted), not all "objections are necessary, or even useful, given the nature of summary judgment motions in general[.]" *Burch v. Regents of the Univ. of Cal.,* 433 F.Supp.2d 1110, 1119 (E.D.Cal.2006). For example, "objections to evidence on the ground that it is irrelevant, speculative, ... or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself[.] ... A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." *Id.* (emphasis in the original). Factual allegations that fell into one or more of these categories had no bearing on my summary judgment analysis.

That said, given the substantial amount of deposition testimony submitted by both parties in support of their respective positions, any necessary rulings on Kaiser's evidentiary objections should be denied as

moot, because the evidence moved against does not change the recommendation that Kaiser's motions (with the exception of the invasion of privacy claim) should be granted. *See Ross v. Indep. Living Res. of Contra Costa,* No. C08–00854 TEH, 2010 WL 2898773, at *2 n. 1 (N.D.Cal. July 21, 2010) (same); *see also Burch,* 433 F.Supp.2d at 1124 (declining "to rule on admissibility because, in a serendipitous turn of events, it found it unnecessary to rely on" the objectionable exhibits). None of the evidence moved against was relied upon in evaluating Denison's invasion of privacy claim against Kaiser. Kaiser's evidentiary objections should also be denied as moot on this ground.

## II. Fisher's Motion (Docket No. 48) for Summary Judgment

### A. Invasion of Privacy

Denison's cause of action for invasion of privacy is premised on Fisher impermissibly accessing her HealthConnect record. (FAC ¶¶ 87–89.) The claim is also alleged against Kaiser.

 Oregon recognizes four separate theories which comprise the tort of invasion of privacy: (1) intrusion upon seclusion; (2) appropriation of another's name or likeness; (3) false light; and (4) publication of private facts. *Mauri v. Smith,* 324 Or. 476, 482, 929 P.2d 307 (1996). Plaintiff relies on the theory of "intrusion upon seclusion" in this case. (*See* Pl.'s Resp. at 39.) To establish this claim, Denison must prove "three elements: (1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a reasonable person." *Mauri,* 324 Or. at 483, 929 P.2d 307.

 Under Oregon law, "an actor commits an intentional intrusion if the actor either desires to cause an unauthorized intrusion or believes that an unauthorized intrusion is substantially certain to result from committing the invasive action in question." *Id.* Fisher does not dispute whether he intentionally accessed Denison's HealthConnect record in violation of Kaiser's confidentiality policies, nor does counsel contest this element.

"The second element of this tort is that the intentional intrusion must be upon the plaintiff's solitude or seclusion of private affairs or concerns." *Id.* at 485, 929 P.2d 307. Fisher argues that the second element is not met because information that has already been disclosed is no longer "private." (Fisher's Mem. at 7.) Fisher is referencing the fact that Denison disclosed to her coworkers that she was "going to see [her] doctor"; that the Department Appointments Report ("DAR"), which Fisher and other MIS's had access to, displayed information regarding her appointment; and that he received an email from Denison confirming her appointment and procedures. (Fisher's Mem. at 3–4.)

Fisher relies almost exclusively on *McLain v. Boise Cascade Corp.,* 271 Or. 549, 533 P.2d 343 (1975). There, the employee was suspected of submitting fraudulent workers' compensation claims, which prompted the employer to hire a private investigator. *Id.* at 551–52, 533 P.2d 343. The investigator crossed plaintiff's property line on numerous occasions to photograph him in various activities around his residence. *Id.* at 552–54, 533 P.2d 343. After recognizing the social utility of exposing fraudulent claims, *id.* at 555, 533 P.2d 343, the Oregon Supreme Court held that "the court properly granted a nonsuit" for invasion of privacy, noting that "plaintiff conceded that his activities which were filmed could have been observed by his neighbors or passersby on the road running in front of his property." *Id.* at 556, 533 P.2d 343.

I find Fisher's reliance on *McLain* unpersuasive. During oral argument, Fisher's counsel claimed that for the purposes of the tort of invasion of privacy "the question is not was it obtained from a health record ... The question is when somebody says to a coworker[ ], I'm going to the doctor this morning ... could there be a reasonable expectation that [this] information somehow remains private, notwithstanding the disclosure that I've just made." (Hr'g Tr. 65.) This argument misses the mark entirely. Third parties cannot access a patient's medical records "without signed authorization that is in compliance with the Release of Information policies[.]" (Gibson Decl. Ex. A at 64; Denison Dep. 42:9–44:17.) As Kaiser's HIPAA compliance manager so aptly put it, "[b]ecause Mr. Fisher did not have authorization from Ms. Denison to access her medical records, and the access was not specifically to provide patient care, that constituted a violation of the confidentiality policies." (Sherlock Decl. ¶ 7.) Kaiser's confidentiality policies are in place for "the protection of Kaiser member medical records" and to ensure compliance with "state and federal laws governing [Protected Health Information], especially [HIPAA]." (Sherlock Decl. ¶ 2.) In fact, Kaiser employees are not "allowed to use Health-Connect to access or copy *even their own records.*" (Sherlock Decl. ¶ 15) (emphasis added). Kaiser's policies in addition to complying with HIPAA, serve the same privacy interests as the tort Denison sues on here. Doubtless Denison's interest qualifies as a "privacy" interest.

"The third and final element of the tort is that the intentional intrusion upon a plaintiff's private affairs or concerns be highly offensive to a reasonable person." *Mauri,* 324 Or. at 485, 929 P.2d 307. The oft-cited section 652B of the Restatement Second of Torts notes that the intrusion "may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by forged court order to permit inspection of his personal documents." Restatement (Second) of Torts § 652B, cmt. b (1977). However, "[t]here is [ ] no liability unless the interference with the plaintiff's seclusion is ... the result of conduct to which the reasonable man would strongly object." Restatement (Second) of Torts § 652B, cmt. d.

■ HIPAA suggests Congress has determined reasonable people want their medical records private and strongly object to those records being inappropriately accessed. Indeed, Kaiser's counterclaim suggests it thinks so as well. Viewing the evidence in the light most favorable to the nonmoving party, a material issue of fact exists as to whether the reasonable man would object to his medical records being accessed without consent, regardless of the information obtained. The same could be said about accessing personal mail, bank accounts, or other personal documents. Accordingly, Defendants' motion for summary judgment on Plaintiff's invasion of privacy claim should be denied.

■ Denison's second allegation is based on Fisher distributing her "private contact information that she intentionally kept secret to protect her daughter and grandchild from domestic violence." (Pl.'s Resp. at 39.) This allegation is fundamentally flawed. Denison claims the dissemination of her "private phone number is highly offensive to a reasonable person in light of the fact that she kept the information secret to protect her daughter and grandchild from domestic violence." (Pl.'s Mem. at 40.) However, Denison admits she never told Fisher her number was to be kept confidential, she simply assumed that the former staffing person would have supplied Fisher with that information.

(Denison Dep. 184:23–185:25) (I "didn't feel I needed to tell him personally") Once Denison communicated her concerns to Fisher, he immediately removed her contact information from the list. (Denison Dep. 201:11–23.) In no way does the record support Denison's counsel's argument that Fisher "knew the reasons that Ms. Perez–Denison kept that information private, but disregarded her privacy and the safety of her family to send that information to all of her coworkers." (Pl.'s Resp. at 40.) Thus, with respect to the second allegation, Defendants' motion for summary judgment should be granted.

## B. Evidentiary Objections

In his reply brief, Fisher raised several evidentiary objections related to the declarations Denison offers in support of her response to Defendants' motions for summary judgment. Specifically, Fisher objects to Paragraph 8 of the Tennant Declaration; Paragraph 7 of the Leach Declaration; Paragraphs 12 and 14 of the Harper Declaration; Paragraphs 6, 10, and 15 of the Lindgren Declaration; Paragraph 8 of Danielle Denison's Declaration; Paragraphs 9 and 11 of the Brooks Declaration; and Paragraphs 18 and 41 of Jeanne Denison's Declaration.

Here, the vast majority of Fisher's objections are duplicative of the summary judgment standard itself. *See Burch*, 433 F.Supp.2d at 1119 (stating, "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself.") Nevertheless, I did not rely on the cited portions of the aforementioned declarations. Thus, Fisher's evidentiary objections should be denied as moot. *See Operating Eng'r Pension Trust Fund v. Clark's Welding and Machine*, 688 F.Supp.2d 902, 907 (N.D.Cal. 2010) ("Because the Court does not rely on the statement in this declaration, it is not necessary for the Court to rule on these [evidentiary] objections.")

## Conclusion

For the reasons stated above, Kaiser's motion (Docket No. 47) for summary judgment should be GRANTED in part and DENIED in part, and Fisher's motion (Docket No. 48) for summary judgment should be GRANTED in part and DENIED in part.

## Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due February 14, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due March 2, 2011. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.